UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUNT CONSTRUCTION GROUP, INC.,
         Plaintiff,

     -v-

BERKLEY ASSURANCE COMPANY,
         Defendant.

19-CV-8775 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

  Plaintiff Hunt Construction Group, Inc. ("Hunt") brings this action against Defendant Berkley Assurance Company ("Berkley"), alleging that Berkley breached the parties' contract and the implied covenant of good faith and fair dealing by failing to defend Hunt in two separate lawsuits. (*See* Dkt. No. 1 ("Compl.").) After Berkley moved to dismiss two of Hunt's claims (Dkt. No. 18), Hunt moved for partial summary judgment (Dkt. No. 27). In response, Berkley filed a cross-motion for summary judgment on all claims. (Dkt. No. 39). For the reasons that follow, Berkley's cross-motion for summary judgment is granted with respect to Count II and denied with respect to Counts I and III, Hunt's motion for partial summary judgment is granted with respect to Count I and denied with respect to Count II, and Berkley's motion to dismiss is denied.

**I. Background**

  **A. Policies**

  This case involves a dispute as to whether Berkley breached its insurance policies with Hunt by failing to defend Hunt in two suits against it. (Compl. ¶ 1.) Hunt is a general contractor that specializes in large projects that "require[] it to coordinate and supervise large teams of

1

subcontractors." (Compl. ¶ 3.)  Berkley is an insurance company with which Hunt took out the policies at issue. (Compl. ¶ 4.)

The two policies at issue have the same material terms but run for different periods: one from June 15, 2016 to July 15, 2017 ("2016 Policy"); the other from June 15, 2018 to June 15, 2019 ("2018 Policy") (collectively, "Policies"). (Compl. ¶¶ 7–9.) In relevant part, the Policies require Berkeley to defend Hunt and pay damages and claim expenses on Hunt's behalf, provided that:

> 1. the Professional Claim arises out of an actual or alleged negligent act, error or omission in the rendering of or failure to render Professional Services by [Hunt], or by a Responsible Entity for whom [Hunt is] legally responsible, on or after the Retroactive Date and before the end of the Policy Period; and
>
> 2. the Professional Claim is first made against [Hunt] during the Policy Period or Optional Extended Reporting Period, if applicable, *and reported in writing by [Hunt] to [Berkley] during one of those periods*.

(Dkt. No. 1-1 at 11 (emphasis omitted and added); Dkt. No. 1-2 at 26–27 (emphasis omitted and added).)

Per the Policies, "Professional Claim means a written demand, demand for arbitration or mediation or suit made against [Hunt] seeking Damages or *correction of Professional Services* and alleging a negligent act, error or omission in the rendering of or failure to render Professional Services." (Dkt. No. 1-1 at 22 (emphasis omitted and added); Dkt. No. 1-2 at 36 (emphasis omitted and added).)

The Policies define Professional Services to include, as relevant here, "Construction Management, Program Management, Project Management, . . . [and] Property Development." (Dkt. No. 1-1 at 22 (emphasis removed); Dkt. No. 1-2 at 36 (emphasis removed).)

The Policies explicitly exclude coverage for claims arising out of "liability under contract, agreement, warranty or guarantee, except such liability that would have existed in the

2

absence of such contract or agreement. *This Exclusion extends to any contractual obligation to make payments to others, including subcontractors,* subconsultants, or their employees." (Dkt. No. 1-1 at 24 (emphasis removed and added); Dkt. No. 1-2 at 38 (emphasis omitted and added).)

When there are multiple claims "arising out of one or more acts, errors, omissions, incidents, events . . . or a series thereof, that are related (either causally or logically), [such claims] will be considered a single Claim" under the Policies. (Dkt. No. 1-1 at 26 (emphasis removed); Dkt. No. 1-2 at 40 (emphasis omitted).) Multiple claims treated as a single claim are considered under the Policies to be made on the date that the earliest of the multiple claims was made, and are covered only by the policy in effect on that date. (Dkt. No. 1-1 at 27; Dkt. No. 1-2 at 40.)

As a "condition precedent to coverage," Hunt must report the claim to Berkley in writing "as soon as reasonably possible, which must be during the Policy Period." (Dkt. No. 1-1 at 28 (emphasis omitted); Dkt. No. 1-2 at 41 (emphasis omitted).) Notably, Hunt could but was not required to provide notice to Berkley "if during the Policy Period, [Hunt] bec[a]me aware of a circumstance that may reasonably be expected to give rise to a Claim." (Dkt. No. 1-1 at 28 (emphasis omitted); Dkt. No. 1-2 at 41 (emphasis omitted).)

Finally, the Policies dictate that New York law governs any dispute. (Dkt. No. 1-1 at 31; Dkt. No. 1-2 at 44.)

  **B.** **Fairmount Austin Project**

In 2014, Hunt was hired as a general contractor for a construction project ("Fairmount Austin Project") by Manchester Texas Financial Group, LLC and Manchester Financial Group, LLC (collectively, "Manchester"). (Compl. ¶¶ 16–22.) On February 16, 2017, Manchester sent a "Notice of Claims" letter ("February 2017 Letter") to Hunt, in which it complained of Hunt's

alleged mismanagement of the project and asked Hunt to correct certain issues moving forward.

(Dkt. No. 20-1.)  The February 2017 Letter, after listing concerns with Hunt's management of

the Project, explained:

> Unfortunately, this does not even come close to comprising an exhaustive list of the issues on the Project which, *if not immediately corrected*, will lead to further and more pronounced delays as the Final Completion Date draws nearer each day . . . Accordingly, this Notice is being delivered to advise Construction Manager of the continued failures to meet significant deadlines, adequately supervise its subcontractors, and *to take actions necessary to remedy the current status of the Project*.  The delivery of this Notice does not constitute nor should it be deemed to be (i) a waiver of or consent by Owner to any Claim under the Agreement or with respect to the Protect, (ii) an election of remedies by Owner, or (iii) a waiver by Owner of any other rights or remedies Owner may have under the Agreement or under applicable law, all of which owner specifically reserves.

(Dkt. No. 20-1 at 2 (emphasis added).)  Hunt took this to be a typical grievance and did not notify Berkley about any Professional Claim related to the Notice.  (Dkt. No. 28 at 5–6.)  In November 2018, Manchester sued Hunt, and Hunt notified Berkley of this Professional Claim shortly thereafter.  (Compl. ¶¶ 17, 19.)  The February 2017 Letter was included in Hunt's notification as an attachment.  (Dkt. No. 28 at 6–8.)

Berkley initially agreed to defend Hunt in February 2019, though it reserved all rights in doing so, including "the right to deny coverage" pending further investigation.  (Compl. ¶ 20; Dkt. No. 31-6 at 8.)  In September 2019, Berkley reversed course and informed Hunt that it would not defend it in the suit because it believed the February 2017 Letter was a Professional Claim that should have been reported earlier.  (Compl. ¶ 21.)  Berkley contends that the notice was untimely because Hunt should have reported the claim during the 2016 Policy period, not the 2018 Policy period.  (Dkt. No. 38 at 7.)

### C. Houston Methodist Project

Hunt was also hired as a general contractor on another project ("Houston Methodist Project"). There, Hunt's supposed mismanagement led one subcontractor, Way Engineering, Inc. ("Way"), to write to Hunt in October 2016 regarding schedule slippage. (Dkt. No. 40-2.) A few months later, in January 2017, Way alerted Hunt that the changes to the schedule would require Way to put in more hours and personnel and would "result in additional costs for which Way Engineering will expect to be compensated. . . . Those costs will be submitted at a later date." (Dkt. No. 40-1 at 2.)

Hunt received a claim from Way for additional compensation — totaling over $25 million — in October 2018, for which it provided notice to Berkley in April 2019. (Dkt. No. 42 ¶ 85.) Berkley rejected coverage for the action on the basis that Way's claims did not concern the provision of Professional Services and, as with the Fairmount Austin Project, reserved its right to raise other coverage defenses in the future. (Compl. ¶ 26; Dkt. No. 42 ¶ 91.) When Way filed suit against Hunt in Texas state court in August 2019, Hunt forwarded the claim to Berkley, which again rejected coverage. (Dkt. No. 42 ¶¶ 92–94.)

## II. Discussion

### A. Legal Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

### B.     Fairmount Austin Project

Hunt contends that Berkley violated the 2016 Policy by declining to defend Hunt against Manchester's claims regarding the Fairmount Austin Project. For its part, Berkley argues that Hunt failed to provide timely notice of Manchester's claim and, thus, Hunt was not entitled to coverage under the Policies. Hunt, meanwhile, maintains that Berkley must provide coverage for three reasons. First, Hunt argues that the February 2017 Letter from Manchester did not constitute a "Professional Claim" under the Policies and, thus, Hunt had no obligation to notify Berkley, as the insurer alleges. Second, Hunt alleges that, even if the February 2017 Letter constituted a Professional Claim, the suit brought by Manchester includes allegations of professional negligence that took place after February 2017 and, therefore, Berkley must defend Hunt against those allegations, which require Berkley to cover the entire action. Finally, Hunt claims that Berkley waived any late-notice argument by initially accepting the claim in February

2019 before notifying Hunt that it would not do so seven months later.  These arguments are addressed in turn.

### 1. Whether the February 2017 Letter Constituted a Professional Claim

Hunt and Berkley dispute whether the February 2017 Letter notifying Hunt of issues with the Fairmount Austin Project meets the definition of a Professional Claim, which would have triggered Hunt's obligation to provide notice.  The Policies define a Professional Claim as a written demand seeking either "Damages or correction of Professional Services."  (Dkt. No. 1-1 at 22 (emphasis removed and added); Dkt. No. 1-2 at 36 (emphasis removed and added).)  The term "correction" is undefined in the Policies.  (Dkt. No. 28 at 16.)  Latching onto this, Hunt contends that the February 2017 Letter did not seek a "correction of Professional Services" within the meaning of the Policies.  (*Id.*)

Hunt offers a definition of "correction of Professional Services" that would apply in instances where a third party hurt by Hunt's conduct requests that Hunt expend funds to fix Hunt's previous mistakes, not to prevent future mistakes.  (*Id.*)  In other words, Hunt urges this Court to read the Policies to find that a Professional Claim exists when Hunt receives "a demand for 'correction of Professional Services' *in lieu of* 'Damages'" for such services.  (Dkt. No. 28 at 17–18.)  Hunt argues that reading "correction" otherwise, to encompass what it characterizes as the prospective request of the February 2017 Letter, would lead to an unworkable result.  Specifically, it contends that requiring a general contractor such as Hunt to forward any "demand for future contractual performance," as it characterizes the February 2017 Letter, would force Hunt to send "the vast majority of its customers' communications" to its insurers.  (Dkt. No. 28 at 16–17.)

7

Berkley, naturally, disagrees. The February 2017 Letter, it maintains, falls directly into the Policies' definition of a Professional Claim, since it set forth a straightforward list of Hunt's negligent acts, errors, or omissions in managing the Fairmount Austin Project and demanded "immediate[] correct[ion]" of those issues. (Dkt. No. 41 at 14–15.) The February 2017 Letter specifically referenced the agreement between Hunt and Manchester and invoked the agreement's Notice of Claims provision. (Dkt. No. 41 at 15.)

The Court agrees with Berkley. A written contract must be interpreted according to the parties' intent, "derived from the plain meaning of the language employed" in a contract, *In re Lehman Bros. Inc.,* 478 B.R. 570, 585–86 (S.D.N.Y. 2012) (internal quotation marks and citation omitted), when it is "read as a whole," *WWW Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162 (1990). Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions." *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (quotation marks omitted).

In a dispute over a contract's meaning, the threshold question is whether the contract terms are ambiguous. *See Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir. 2000). "[A]n ambiguity does exist in an insurance policy where a term or terms might be susceptible to two or more reasonable interpretations." *D.C. USA Operating Co., LLC v. Indian Harbor Ins. Co.*, 07 Civ. 116, 2007 WL 945016, at *7 (S.D.N.Y. Mar. 27, 2007). "If the court finds that the contract is unambiguous, the court should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence." *Id.* (citation omitted). Where an insurance policy is ambiguous, New York law requires any ambiguity to be construed against the insurer. *See Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 353 (1978); *Hartol Prods. Corp. v. Prudential Ins. Co.,* 290 N.Y. 44, 49 (1943). "[A] contract of insurance, drawn by the insurer,

8

must be read through the eyes of the average [person] on the street or the average [person] who purchases it." *Lachs v. Fidelity & Cas. Co. of New York,* 306 N.Y. 357, 364 (1954). *See also Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011) ("Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured." (citation omitted)).

Here, Hunt argues that the definition of a Professional Claim in the Policies is ambiguous. (Dkt. No. 28 at 16.) The Court disagrees. The natural reading of the statute supports Berkley's interpretation: A Professional Claim is a written demand in which a party seeks either damages from Hunt *or* for Hunt to correct Professional Services. Professional Services, relevantly, includes "Project Management." (Dkt. No. 1-1 at 11; Dkt. No. 1-2 at 11.) While Hunt contends the February 2017 Letter was only about prospective issues, the Letter itself is clear that it was "most concern[ed]" about the "lack of energy from the workers on the site" and "the lack of supervision" from Hunt to keep the project on schedule. (Dkt. No. 31-4 at 2.) The Letter demanded that these issues "will be addressed" — i.e., corrected. (*Id*.) Even should this Court find that definition of Professional Claim is "susceptible to two or more reasonable interpretations," *D.C. USA Operating Co., LLC*, 2007 WL 945016, at *7, the "average [person] on the street" would not interpret the "or" to somehow include the "in lieu of" meaning that Hunt claims. The word "correction," too, is clear on the face of the Policies. While Hunt's fear that it must forward every letter received from a party alleging bad work may have some basis — this Court does not opine on whether the February 2017 Letter is par for the course in the construction business — such a concern is not sufficient to defeat the plain language of the Policies.

Thus, the February 2017 Letter constituted a Professional Claim under the policy.

### 2. Whether the Fairmount Austin Project Allegations Relate Back to the Issues Noted in the February 2017 Letter

Next, Hunt contends that, because the suit brought by Manchester includes numerous allegations based on issues arising after the February 2017 Letter, it gives rise to separate claims from whatever claim Hunt may have had with respect to the February 2017 Letter. Hunt cites alleged issues with the Fairmount Austin Project that Manchester claimed occurred between August 2017 and spring 2018 — including a portico collapse, flooding, and poor duct work insulation — to illustrate how these issues supposedly "have nothing to do" with the complaints in the February 2017 Letter. (Dkt. No. 28 at 20.) Berkley, meanwhile, characterizes the issues in the February 2017 Letter as relating to "delay, inappropriate management oversight and personnel, inadequate staffing, poor workmanship, and damages caused by these failures." (Dkt. No. 41 at 20.) The eventual claim brought by Manchester, Berkley alleges, is merely an outgrowth of those issues, part and parcel of the mismanagement leading to the February 2017 Letter. Under the Policies, the causal or logical relation-back of these allegations would lead the Fairmount Austin Project claim to be considered a single claim that should have been brought to Berkley's attention during the 2016 Policy period.

A close read of the February 2017 Letter and Manchester's Demand for Arbitration confirms Berkley's characterization. (Dkt. No. 20-1; Dkt. No. 20-2.) The incidents that Hunt presents as occurring post-February 2017 stem from Manchester's central grievance: the lack of "competent onsite management and supervision" and "absence of effective management" that would lead to delay on a project for which time was of the essence. (Dkt. No. 20-2 ¶¶ 21, 39, 46.) Manchester brought many of these concerns to Hunt before the February 2017 Letter, including via email, through requests for written change orders, and by directly "rais[ing] the issue [of mismanagement] with [Hunt]." (Dkt. No. 21-1 at 1–2.) After the February 2017 Letter,

10

Hunt brought executives from its parent company to meet with Manchester and assuage its concerns, offering guarantees that the project would be better managed and completed in time. (Dkt. No. 21-2 ¶¶ 53–69.)  Nonetheless, Manchester alleged in its Demand for Arbitration, Hunt was aware that the guarantees were illusory, as multiple subcontractors had complained to Hunt that the schedules it put forth were "hopelessly unrealistic."  (Dkt. No. 21-2 ¶ 71.)  The damages sought by Manchester through arbitration are due to the alleged delay, cost overruns, and shoddy workmanship that are logically related to the mismanagement for which Manchester sought correction in its February 2017 Letter.  Hunt has a single claim, dating back to the 2016 Policy period, with respect to the Fairmount Austin Project.

None of Hunt's case law is to the contrary.  In fact, the cases cited by Hunt support the Court's conclusion, holding that a "sufficient factual nexus" rendering claims interrelated does not necessarily need "precisely the same parties, legal theories, Wrongful Acts, or requests for relief" — just "specific overlapping facts."  *Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13 Civ. 1013, 2014 WL 1876984, at *5–6 (S.D.N.Y. May 8, 2014) (internal quotation marks and citation omitted).[1]  In *Glascoff*, the court concluded that two claims were not interrelated because, instead of alleging the "same events," one claim alleged "specific allegations of fraud" whereas the other referenced "general misconduct."  *Id*. at *6 (citation omitted).  Here, both the February 2017 Letter and the Demand for Arbitration reference the same factual circumstance: Hunt's consistent and unaddressed failure to properly manage the Fairmount Austin Project.

---

[1] While the insurance policy at issue in *Glascoff* covered "Wrongful Acts" instead of Professional Claims, the coverage is sufficiently analogous.

### 3. Whether Berkley Waived Its Late-Notice Argument

Hunt argues that New York law requires insurers who gain actual or constructive knowledge of a late-notice defense to immediately raise the defense or risk waiving it. (Dkt. No. 28 at 13.)

Berkley responds that the doctrine of waiver is not applicable to questions of coverage. (Dkt. No. 41 at 21–22 (citing *Albert J. Schiff Assocs., Inc. v. Flack*, 51 N.Y.2d 692, 698, 700 (1980).). Coverage here is implicated, Berkley contends, because the Policies set forth that timely notice is a condition precedent to coverage. (Dkt. No. 1-1 at 6, 19; Dkt. No. 1-2 at 5, 16.)

Hunt is correct. While "[t]he New York Court of Appeals held in *Albert J. Schiff Assoc.* . . . that where the issue is the existence or non-existence of coverage . . . the doctrine of waiver is simply inapplicable," that is not the case here. *Westport Res. Inv. Servs., Inc. v. Chubb Custom Ins. Co.*, 2003 WL 22966305, at *6 (S.D.N.Y. Dec. 16, 2003), *aff'd*, 110 F. App'x 172 (2d Cir. 2004) (citation omitted). Cases in which courts have found waiver "typically involve an insurer's attempt to disclaim coverage on the basis of lack of notice," as Berkley attempts here. *Id*. (citation omitted). Indeed, the very case cited by Berkley distinguishes between unwaivable coverage and "courts' disfavor of forfeitures of the insured's coverage which would otherwise result where an insured breached a policy condition, as for instance, *failure to give timely notice*." *Albert J. Schiff Assocs., Inc.*, 51 N.Y.2d at 698.

The Second Circuit has "unequivocally recognized" that "when one specific ground of forfeiture is urged against [an insurance] claim, and a refusal to pay is based upon a specific ground, all other grounds are waived." *State of N.Y. v. AMRO Realty Corp.*, 935 F.2d 1420, 1432 (2d Cir. 1991) (citations and internal quotation marks omitted); *see also Olin Corp. v. Insurance Co. or North America*, 2006 WL 509779 at *4 (S.D.N.Y. Mar. 2, 2006) (recognizing

the "well-settled rule that an insurer's assertion of certain defenses to coverage is deemed *conclusive* evidence of the insurer's intent to waive other unasserted grounds" (emphasis in original)). "New York law establishes that an insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." *Amro Realty Corp.*, 935 F.2d at 1431. Berkley's failure to raise the late-notice defense when it initially denied coverage — given that it had constructive knowledge of the claim against Hunt, as the February 2017 Letter was included as an attachment to the Hunt's 2018 petition (Dkt. No. 29 ¶ 45; Dkt. No. 31-5; Dkt. No. 42 ¶ 45) — fits squarely within case law finding waiver.[2]

Alternatively, Berkley argues that language in its February 2019 response to Hunt's claim precludes any waiver or estoppel. Berkley's response included the following language: "Berkley reserves all of its rights under the Policy and law. Berkeley reserves the right to raise additional terms and conditions as a defense to coverage, if appropriate. Our failure to cite policy language at this time does not preclude us from raising other coverage defense in the future, if warranted." (Dkt. No. 31-6 at 8.) Berkeley's argument here also fails. While some courts have found a reservation of rights to preclude a waiver defense, they usually do so in instances in which the reservation of rights expressly raises the specter of a late-notice defense. *See, e.g.*, *Gelfman v. Cappitol Indem. Corp,*, 39 F.Supp.3d 255, 269–70 (E.D.N.Y. 2014) (finding that the insurer's having "*expressly* reserved its rights to deny coverage based on late notice" defeated waiver); *cf. J.M. Morgan Secs. Inc. v. Vigilant Ins. Co.*, 359 N.Y.S.3d 864, 701–02 (N.Y. Sup. Ct. 2016)

---

[2] While Berkley denies that it was "fully aware" of the contents of the February 2017 Letter, attached to Hunt's 2018 petition, this Court is persuaded that including the Letter as an attachment is sufficient to put Berkley on constructive notice of a possible late-notice defense.

(finding that although insurers "always reserved their rights and advised that their determination was non-final[, and] notwithstanding that the letters contained boilerplate 'reservation of rights' language, the Insurers' other statements left no doubt that they were disclaiming coverage" on one ground and, thus, waived the other ground).  Here, Berkley did not directly state it was considering a late-notice defense, and the boilerplate language was insufficient to lead Hunt to think otherwise.

Accordingly, the undisputed facts establish that Berkley has waived any late-notice defense as a matter of law.

* * *

Because Berkley waived its late-notice defense, its motion for summary judgment and motion to dismiss are denied and Hunt's motion for summary judgment is granted as to the Fairmount Austin claim.

### C.     Houston Methodist Project

With regard to the Houston Methodist Project, Berkley advances three arguments: (1) that the Houston Methodist claim involves *intentional* acts, whereas the Policies cover only negligent acts; (2) that the Policies specifically exclude coverage out of "liability under contract . . . extend[ing] to any contractual obligation to make payments to others, including subcontractors"; and (3) to the extent the policies cover the Houston Methodist Claim, Hunt's failure to notify Berkley about a January 2017 Letter from Way before the 2016 Policy expired precludes coverage.  (Dkt. No. 1-1 at 15; Dkt. No. 41 at 25–29.)  The Court need only address the first of these arguments.

As Berkley suggests, it was contractually required to provide coverage for a "Professional claim [that] arises out of an actual or alleged *negligent* act, error or omission in the

rendering of or failure to render Professional Services" by Hunt.  (Dkt. No. 1-1 at 6 (emphasis removed and added).)  The only claims in the Way suit against Hunt are *intentional*: breach of contract, unjust enrichment, violations of the Texas Prompt Pay Act, a declaratory judgment that Way is not liable for the allegedly Hunt-caused delays, and indemnification.  (Dkt. No. 31-10 ¶¶ 39–62.)  None of these claims, either in the Way suit or as presented in Hunt's materials before the Court, arises out of Hunt's negligence.  Rather, they stem from Hunt's intentional nonpayment of subcontractors:  While Way alleges that the overruns were caused by Hunt's gross negligence, the claims are derived from Hunt's decision to ignore its alleged contractual obligations.  (*Id*.). Thus, under the Policies, Berkley has no obligation to represent Hunt.

Hunt's motion for summary judgment is denied, and Berkley's motion for summary judgment is granted, as to the Houston Methodist claim.

### D.     Covenant of Good Faith and Fair Dealing

Hunt's third claim is for breach of the implied covenant of good faith and fair dealing.  In this claim, Hunt argues, *inter alia*, that Berkley did not deal with claims expeditiously and fairly, took meritless coverage positions, and changed coverage positions without any basis.  However, "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract." *Deer Park Enterprises, LLC v. Ail Sys., Inc.*, N.Y.S.2d 89, 90 (2d Dep't 2008); *see also Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 54 (2d Cir. 2010).  ("If the allegations [of a breach of the covenant and good faith and fair dealing] do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as

15

superfluous as no additional claim is actually stated."). Such is the case here: Both parties, in briefing their respective summary judgment motions, acknowledge that the resolution of this claim turn on the success of the Fairmont Austin and Houston Methodist breach-of-contract claims. (Dkt. No. 47 at 25; Dkt. No. 54 at 10.) Because this Court has granted summary judgment in Hunt's favor on the Fairmount Austin claim, summary judgment is not warranted here. Accordingly, Berkley's motion for summary judgment and motion to dismiss are denied as to the implied-covenant claim.

### III.     Conclusion

For the foregoing reasons, the motion for summary judgment by Defendant Berkley Assurance Company is GRANTED as to the Houston Methodist claim and DENIED as to the Fairmount Austin and implied covenant of good faith and fair dealing claims. The motion for partial summary judgment by Plaintiff Hunt Construction Company is GRANTED as to the Fairmount Austin claim and DENIED as to the Houston Methodist claim. The motion to dismiss by Defendant Berkley Assurance Company is DENIED.

The Clerk of Court is directed to terminate the motions at Docket Numbers 18, 27, and 39.

SO ORDERED.

Dated: November 30, 2020
New York, New York

_____
J. PAUL OETKEN
United States District Judge